# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 19, 2005

## STATE OF TENNESSEE v. LARRY HOLMES

### Appeal from the Criminal Court for Shelby County
#### No. 03-02148     Chris Craft, Judge

---

### No. W2004-01576-CCA-R3-CD

---

A Shelby County jury convicted the defendant, Larry Holmes, of four counts of especially aggravated kidnapping, a Class A felony, two counts of aggravated robbery, a Class B felony, and one count of aggravated burglary, a Class C felony. The trial court merged the two aggravated robbery convictions into the especially aggravated kidnapping convictions and sentenced the defendant as a repeat violent offender to concurrent sentences of fifty-five years at one hundred percent for the especially aggravated kidnapping convictions and as a career offender to fifteen years for the aggravated burglary conviction to be served consecutively to the especially aggravated kidnapping sentences for an effective sentence of seventy years. On appeal, the defendant contends that (1) the evidence was not sufficient to support his convictions for especially aggravated kidnapping and aggravated robbery, (2) the trial court erred by denying his request for a mistrial based upon a misstatement by an officer testifying for the state, and (3) the trial court erred in imposing his sentences.[1] We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Charles E. Waldman, Memphis, Tennessee, for the appellant, Larry Holmes.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; William L. Gibbons, District Attorney General; James A. Wax, Jr., and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] We note that although the defendant requested oral argument in his brief, he failed to place the request on the cover page as required by Rule 35(a), T.R.A.P. This case has been assigned on the briefs.

**OPINION**

This case relates to the invasion of the home of Trina Boyce at approximately 4:00 a.m. on October 16, 2002, by an undetermined number of intruders. Ms. Boyce testified that she lived with her brother, husband, and five children. She said that the house was a split-level style home with the main entrance on the first level and from the entryway, a set of stairs led to a lower level from which one can access the back yard, the swimming pool, and the lake. She said the first level had a deck overlooking the swimming pool. She said that on the night of October 15, 2002, her husband was out of town on business and that she was at home with her brother and five sons who at that time were ages three, five, and the remainder were teenagers. She said that her husband called from Dallas, Texas, at approximately 1:30 a.m. the morning of October 16 and that she talked to him for about one hour. She said that at about 3:30 a.m., their dog began barking and would not stop. She said that a few minutes later, her son Demarcus came upstairs wanting to borrow one of her miniskirts for a cheerleading skit at school. She said she sent him back downstairs and shortly thereafter, began hearing a pounding sound like an unbalanced washing machine. She said that she got up and went to the foyer because the dog was still barking and that she then heard voices at the front door saying, "Hurry up, hurry up." She said she yelled to Demarcus that someone was trying to break into the house, closed the foyer door, and headed for her bedroom where her two youngest children were sleeping.

Ms. Boyce testified that by the time she reached her bedroom door, she could see the first man entering the house wearing a ski mask and dark clothing. She said that they were claiming to be the police but that she knew the police did not wear masks. She said that the second man was wearing a sweat suit and a hooded shirt and that she could not see his face. She said that she locked the bedroom door but that the men pounded on it and eventually kicked it in. She said that they entered the bedroom and said, "B****, where's your husband? We going to kill your m***** f****** husband." She said she told the men her husband was not home, at which point they made her lie down and handcuffed her wrists behind her. She said the men asked where she kept the drugs, jewelry, and safe. She said she told them she did not have any money, a safe, or any drugs in the house. She said she could hear the men ransacking the house and asking each other, "Where is the s***?" She said that she heard one of them direct the others to check downstairs and upstairs and that they asked her how many people were in the house. She said she told them but the number of persons found did not coincide with her information because Demarcus had escaped. She said the men began looking for Demarcus.

Ms. Boyce testified that when the men left her alone to look for Demarcus, she crept downstairs and found her other two teenage sons and her brother handcuffed and lying on the ground. She said she hid downstairs and then heard some of the men yelling that she had escaped. She said that while they began to look for her outside, she went upstairs to get her two younger children. She said that she was still in handcuffs but that she was able to put one son on her back and the other followed her. She said that when she returned downstairs with both children, she heard the men running and yelling, "It's the police. It's the police." She said the men made lots of noise and then jumped off the back deck. She said police officers arrived shortly thereafter. She said they

removed the handcuffs from her and her family, searched the house, and apprehended two of the intruders. She said that she heard four different voices during the incident but that she saw only two men, the first person who entered the house and the man directly behind him. She said that the police recovered her wallet, checkbook, and identification and that they retrieved a purple Crown Royal bag containing quarters which she had kept in a nightstand drawer in her bedroom.

Ms. Boyce testified that the first man to enter the house carried a dark-colored semi-automatic weapon. She said that one man threatened to kill her husband and that another told her he would kill her if she did not tell them the location of the drugs and money. She acknowledged that she was placed in fear and held against her will. She said that apart from believing that she recognized the voice of one intruder, she was unable to identify any of the men who broke into her house.

On cross-examination, Ms. Boyce acknowledged that she could not identify the defendant as one of the perpetrators and that she told the police there may have been as many as five or six intruders that morning. She said that the entire episode lasted twenty to twenty-five minutes and that she was upstairs for fifteen to twenty minutes. She said her brother and two thirteen-year-old children were handcuffed and lying on their stomachs on the floor downstairs. She said that an eight-foot fence separates her property from that of the neighbor on the north side, that the lake is about one hundred feet from the back door entrance to the house, and that the backyard may be entered through two gates, one on either side of the house. She acknowledged that her mouth was not gagged, her feet were not tied, and nothing was placed over her head during the break-in.

Demarcus Teheir Boyce testified that on the morning the intruders invaded his home, his dog woke him earlier than usual. He said his bedroom was downstairs and located the farthest distance from the stairway. He said that he thought the dog needed to go outside and opened the back door but that she would not go outside and went upstairs instead. He said he followed her. He said the time was 4:25 or 4:30 a.m. He said that the dog started barking near the front door when he started to eat breakfast and that he went to the dining room window to check outside but before he reached the window, he heard someone at the front door. He said the noise sounded like "metal and stuff being turned and banging." He said his mother thought the noise was coming from him and asked what he was doing. He said that as she walked to the front door, he saw a van in the driveway and the shadow of someone standing at the door who told the dog to shut up. He said that his mother told him to go and ran toward her bedroom and that he then ran to the kitchen and out the back door. He said that he stood at the window for a moment and watched someone kick in the front door and run toward his mother's bedroom with a gun. He said he saw a second man enter the house but did not see either man's face. He said he ran toward the lake, jumped a couple of fences, and ran across the street to the home of a neighbor, who called the police.

On cross-examination, Demarcus acknowledged that he did not know the defendant and had never seen him before. He acknowledged that he did not wear eyeglasses or contact lenses.

Andre Weathers, Trina Boyce's brother, testified that he occasionally lived with the Boyce family and was staying at their house when the incident occurred. He said he slept in the guest bedroom located downstairs. He said that on October 16, 2002, at approximately 4:30 a.m., he heard voices upstairs and a rumble, like someone kicking in the door. He said he could discern running and movement but did not recognize the voices. He said he went to the bottom of the stairs and heard a few of the men say they were the police and looking for something. He said that he heard another man say someone is downstairs and that he attempted to return to his room but one of the men came downstairs, stopped him, and instructed him to lie flat on the ground with his hands behind his back. He said that because it was dark, he could not see what the man was wearing or any details concerning his appearance. He said that the man had a nickle-plated handgun but that he could not tell the caliber of the weapon. He said the man handcuffed his wrists, picked him up by the handcuffs, and asked him who else was downstairs. He said he replied that his two nephews, A.J. and Arron, were sleeping in a bedroom down the hall and called their names. He said that the boys did not respond immediately and that he called them again. He said a second man arrived just as the boys emerged from their bedroom. He said they were handcuffed and placed face down on the ground together.

On cross-examination, Mr. Weathers estimated that five or six men were involved in the incident. He acknowledged that in his statement to police, he said one of the men had a .38 caliber nickel-plated revolver and the other had what resembled a 9 millimeter or a .45 caliber black semi-automatic weapon. He acknowledged that his face and mouth were not covered and that his feet were not bound. He said that even when the men left the area downstairs, he was frightened and unable to get up or move around until the police arrived.

Arron Boyce testified that on October 16, 2002, he was awakened by his brother, A.J., who told him their uncle was calling them. He said he and his brother shared a bedroom on the downstairs level, where the bedrooms of his uncle Andre and Demarcus were also located. He said he went into the hallway and saw his uncle standing with his hands behind his back and a gun pointed at his head. He said that his uncle told him to do whatever the gunman said and that the man instructed the boys to get on their knees and put their heads down. He said that the man was short and wore dark clothes and a mask and that a second man who was taller and light-skinned joined them. He said the men put handcuffs on him and his brother, claimed they were the police, and asked them where the money was. He said that after the men placed him and his brother face down on the ground alongside his uncle, he noticed the handcuffs were made of plastic. He said that when the two men went upstairs, he removed his handcuffs and also helped A.J. remove his. He said he had contact with only two of the intruders and did not recognize either one, except that one of them had a familiar voice.

On cross-examination, Arron acknowledged that he did not know the defendant and had never seen him at their house. He acknowledged that his mother was moving about the house even though handcuffed and that he could have moved about the house if he had wanted. He conceded that he was only "kept down" while the men were present but said that they had instructed the victims to stay where they were.

-4-

Anthony Boyce, nicknamed "A.J.", testified that on October 16, 2002, he was awakened at approximately 4:20 a.m. by his uncle repeatedly calling his and his brother's names. He said that he woke Arron and that they went into the hallway. He said that as soon as they left their room, two men told them to get on the floor. He said they complied and, two minutes later, were instructed to go back down the hallway where handcuffs were placed on their wrists. He said they were then told to get down again. He said he recognized the voice of one of the men as a friend of his father, and he identified one of the codefendants in court. He said that the man asked them the location of the money and that both men had guns. He said one man had a gun pointed at his uncle's head. He said that the men left to look for Demarcus and that he heard them run out the door when someone said "police." He said the police arrived and removed the handcuffs.

On cross-examination, A.J. acknowledged that he had never seen the defendant before that day. He acknowledged that he did not realize the handcuffs were plastic until his brother told him. He acknowledged that his mother was moving about the house, even though handcuffed, and that he also could have moved. He denied that any of them moved after learning the handcuffs were fake and said that they all stayed on the ground until the police arrived. He conceded that his feet were not bound and that his mouth was not gagged.

Memphis Police Officer David Beckham testified that on October 16, 2002, he arrived at the house at approximately 4:30 a.m. He said that other police officers were already present and that he heard yelling in the backyard. He said he ran to the back and observed Officers Jordan and Baker taking a suspect into custody. He testified he overheard the suspect say he was in the market to buy some real estate property and was looking at the backyard because he was interested in purchasing the house. He identified the codefendant, Jones, as the suspect in custody. He said he then entered the house and found two adults, two young children, and two teenagers on the floor. He said at least three were in handcuffs. He said he secured the house and began removing the handcuffs. He said one of the teenagers had removed the handcuffs himself. He said the female adult was crying, the male adult was angry, and the teenagers were nervous and frightened.

On cross-examination, Officer Beckham testified that he recalled seeing the defendant either in the victims' backyard or in the back of the police car on the day of the incident. He said the victims were able to give only general descriptions of the perpetrators: five to six African-American males wearing dark clothing. He acknowledged that they gave no details regarding facial characteristics. He said the officers recovered three handguns, several ski masks, and the victim's property, which was scattered throughout the backyard.

Memphis Police Officer Michael Bach testified that he responded to the call regarding the home invasion robbery in progress at the victims' house. He said that other officers were present when he arrived at approximately 4:30 a.m. and that he and Officer Beckham assisted in securing the house. He said Officer Beckham helped the victims out of their handcuffs while he went to the backyard and helped search for suspects. He said the officers found the defendant hiding in some shrubs under a dock or pier in the backyard of the neighbor's house. He said that Officer Baker removed the defendant from the bushes and handcuffed him. He said that the defendant complained

he had two broken legs and that he was transported to the hospital. He said that he and his partner, Officer Cave, went to the hospital and recovered from the defendant a purple Crown Royal bag containing some quarters. He identified the bag recovered from the defendant at the hospital and acknowledged that his name and that of Officer Cave was written on the evidence envelope.

On cross-examination, Officer Bach was asked if he recovered the purple Crown Royal bag, and he replied he did not. He also admitted that he was not present when the bag was discovered. He said Officer Cave recovered the bag from the defendant and then told him about it. He conceded that he did not know the defendant was in fact "hiding" in the bushes and that he did not know what the defendant was doing in the bushes or how he came to be there.

Memphis Police Officer William Harsley testified that he worked in the crime response unit and responded to a call to take photographs and collect and tag evidence at the crime scene. He said he collected a .45 caliber pistol and a .38 caliber pistol. He acknowledged he did not lift fingerprints from any of the evidence collected, including the pistols. He explained that due to the texture of the weapons, they would have to be chemically processed because the fingerprints could not be removed with powder.

Memphis Police Officer Jeffrey Jordan testified that he and Officer Baker were the first officers to arrive at the crime scene and that they saw a white Chevy van in the driveway with the motor running. He said they turned off the motor and then heard some commotion coming from the rear of the house. He said it sounded like a bunch of people running around, throwing things. He said he went to the left of the house, kicked the fence in, and walked around the corner of the house. He said he saw a black pistol by the swimming pool and heard the commotion moving away from him. He said he followed the sounds to another fence which separated the victim's backyard from the neighbor's property. He said that the end of the fence jutted over the lake and that he saw wet footprints and a dock on the other side. He said that he also saw one of the suspects lying in the grass on the neighbor's property about twenty-five feet from the fence and asked him how he got there. He said the suspect replied he was in the adjacent yard inspecting the estate because he was interested in purchasing the property when a group of men came running from the house. He said the victim's checkbook, driver's license, and wallet were lying at the suspect's feet. He said that the suspect's ankle was injured and that the officers had to help him get to the police car.

Memphis Police Officer James Baker testified that he and Officer Jordan arrived at the crime scene at the same time. He said he positioned his patrol car in the driveway to block a white van which had a broken window and popped steering column. He said the van was parked but the motor was running. He said that he headed for the backyard by the right side of the house and heard Officer Jordan yell that someone was running to the right. He said Officer Jordan ordered the suspect to halt and he did. He said they then found footprints leading through the yard to the adjacent property and began searching the perimeter of the yard. He said he saw two boots sticking out from underneath some bushes near the dock, with the remainder of the body lying underneath the pier. He said that he asked the defendant to come out but that the defendant replied he could not because his legs were broken. He said that the officers pulled him out from under the dock and asked what happened and

that the defendant replied, "Oh, it was just a drug deal gone bad." He said the defendant claimed he arrived in the white van parked in front of the house. He said that the officers handcuffed the defendant and sent for an ambulance to transport him to the hospital.

On cross-examination, Officer Baker acknowledged that he patted down the defendant when he was removed from under the dock in a search for weapons and said that he removed a flashlight. He said he did not search inside the defendant's pockets.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to convict him for the especially aggravated kidnapping offenses and the aggravated robbery offenses. He argues that none of the victims identified him as one of the intruders and that the state presented no evidence that he was inside the house or took any property from the victim. The state contends the evidence was sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to sustain the convictions for especially aggravated kidnapping, the state had to prove beyond a reasonable doubt that the defendant knowingly removed or confined each of the four victims unlawfully so as to interfere substantially with their liberty and that he accomplished the act with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. T.C.A. §§ 39-13-302, -305. Aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear and accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. T.C.A §§ 39-13-401, -402.

With regard to the especially aggravated kidnapping convictions, we believe a rational juror could conclude beyond a reasonable doubt that Ms. Boyce, her two sons, and her brother, Andre Weathers, were confined unlawfully so as to interfere substantially with their liberty. Ms. Boyce testified that two intruders kicked in her bedroom door, made her lie on the bed, and handcuffed her wrists behind her. The men then questioned her concerning the location of drugs, money, and a safe and left her handcuffed on the bed while they searched for her son. Andre Weathers testified that he was stopped en route to his bedroom and instructed to lie flat on the ground with his hands behind his back. The intruder then handcuffed his wrists and placed him face down on the ground. A.J. and Arron Boyce said they were removed from their bedrooms, their hands were handcuffed, and they

were placed face down alongside their uncle on the floor of their home. Arron acknowledged that his mother was moving about the house even though handcuffed and that he could have moved about the house if he had wanted after the men left the downstairs area, but he also said that the intruders had instructed them to stay where they were. A.J. testified that none of them moved until the police arrived, even after learning the handcuffs were plastic. According to Officer Beckham, the victims were on the floor when the police arrived and at least three of the victims were handcuffed. Ms. Boyce testified that the two intruders in her bedroom both had guns. In his statement to the police, Mr. Weathers said that one intruder had a .38 caliber nickel-plated revolver and the other had what looked like a 9 millimeter or a .45 caliber black semi-automatic weapon. Arron and A.J. both testified that one of the men involved with handcuffing them had a gun to their uncle's head. Accordingly, the proof also shows that the offenses were accomplished with a deadly weapon.

As to the aggravated robbery convictions, the evidence shows that the intruders took Ms. Boyce's wallet, checkbook, and identification. The items were discovered by Officer Jordan at the feet of the suspect found lying on the neighbor's property with an injured ankle. The police recovered three guns at the crime scene, and at least two of the intruders were armed according to the testimony of Ms. Boyce and Mr. Weathers. Ms. Boyce testified that she was frightened during the robbery. Viewed in the light most favorable to the state, we conclude that a rational juror could find beyond a reasonable doubt that the evidence proved the defendant intentionally or knowingly committed theft of property from Ms. Boyce by violence and by putting her in fear and that he accomplished the crime with a deadly weapon.

Relevant to all convictions, the defendant asserts that none of the victims identified him as one of the intruders and that the state presented no evidence that he was inside the house or took any property from the victim. He claims that the only connection between himself and what took place inside the Boyce home was the evidence concerning the recovery of a purple Crown Royal bag by one of the officers at the hospital. However, he ignores the fact that he was found in the bushes underneath the Boyce's dock with two broken ankles at 4:30 a.m., immediately after the crime was committed. The codefendant was discovered nearby at the same time in possession of the victim's property. When found, the defendant told the officers "it was just a drug deal gone bad" and admitted arriving in the white van parked in front of the house. A defendant is criminally responsible for an offense committed by the conduct of another if he acts with intent to promote or assist in the commission of the offense or to benefit in the proceeds or results of the offense and thereby solicits, directs, aids, or attempts to aid another person in committing the offense. T.C.A. § 39-11-402. We believe that this proof is sufficient for a rational juror to conclude that the defendant assisted in the commission of the robbery and the kidnapping offenses. The defendant is not entitled to relief on this issue.

## II. MOTION FOR MISTRIAL

The defendant contends that the trial court erred by denying his request for a mistrial. He argues that Officer Bach's testimony concerning the purple Crown Royal bag found on the defendant at the hospital was inadmissible hearsay and that the jury's hearing the testimony rendered a fair trial

impossible.  He also asserts that the trial court's curative instruction fell far short of what was necessary to serve justice.  The state concedes that the testimony in issue was inadmissible but contends that the trial court did not abuse its discretion by denying the defendant's request for a mistrial because the trial court gave a curative instruction, the witness was impeached, and the state's case against the defendant was strong.

The record reflects that the purple Crown Royal bag was admitted into evidence based on Ms. Boyce's identification of the bag as the same bag she used to store quarters and kept in the nightstand near her bed.  Regarding the transportation of the defendant to the hospital and recovery of the bag, the following colloquy occurred:

| | |
|---|---|
| [State]: | What happened with [the defendant] after he was taken into custody? |
| [Officer Bach]: | I believe he was transported to the Med. |
| [State]: | At some point did you yourself go to the Med? |
| [Officer Bach]: | Yes, I did. |
| [State]: | Who was at the Med when you went there? |
| [Officer Bach]: | My partner George Cave. |
| [State]: | And who–how did George Cave get to the hospital? |
| [Officer Bach]: | He rode in the ambulance with [the defendant]. |
| [State]: | To your knowledge was any property recovered from [the defendant] at the hospital? |
| [Officer Bach]: | Yes. |
| [State]: | What was recovered? |
| [Officer Bach]: | A purple Crown Royal bag that had some coins in it.  I think they were quarters. |
| [State]: | Let me pass you this–what's been marked as State's Exhibit Number 10 and ask you if you |

recognize it? If you could open that up, Officer Bach. And I'd ask you if you recognize the items that are contained in that envelope?

[Officer Bach]: Yes, I do.

[State]: And what is that?

[Officer Bach]: It's a purple Crown Royal bag or something similar to it. It believe it is a Crown Royal bag. And it has several–several coins inside it. They appear to be quarters all of them.

[State]: And the envelope which the Crown Royal bag is contained in, on that envelope has your name as well as Officer Cave; correct?

[Officer Bach]: Yes.

[State]: And that's the property that you recovered from [the defendant] on the night–on the morning of October 16; correct?

[Officer Bach]: Yes.

[State]: I pass the witness, Your Honor.

[Defense Counsel]: Good afternoon, Officer Bach. Did you recover that purple bag?

[Officer Bach]: No, I did not.

[Defense Counsel]: You didn't. You just–were you there when the bag was actually discovered?

[Officer Bach]: No, I was not.

[Defense Counsel]: So how did you get this bag?

[Officer Bach]: Officer Cave, my partner, was with I believe another officer gone to the Med and they recovered it from him and Officer Cave–

-10-

[Defense Counsel]:   You weren't present when it was recovered from him?

[Officer Bach]:   No, sir.

[Defense Counsel]:   So you're only relying on what Officer Cave told you?

[Officer Bach]:   Yes, sir.

[Defense Counsel]:   All right. You weren't present. You didn't see it produced from any part of [the defendant's] property?

[Officer Bach]:   Yes, sir; that's correct.

[Defense Counsel]:   Okay. Yet you put it in that bag and put your information on it?

[Officer Bach]:   Yes, sir.

At the conclusion of Officer Bach's testimony, defense counsel moved to strike his testimony relating to the purple bag because he did not retrieve it from the defendant. The state said that the officer who allegedly removed the bag from the defendant was out of town and unavailable to testify. The trial court determined that Officer Bach's testimony that the bag and coins were recovered from the defendant was inadmissible hearsay and concluded that it must instruct the jury not to consider anything that another officer at the hospital told Officer Bach relating to the coins. The trial court found admissible the testimony that the defendant was taken to the hospital, that Officer Bach was also at the hospital, and that he received the bag of coins there. The trial court denied defense counsel's request for a mistrial and instructed the jury as follows:

> We have a problem in that there's been some hearsay testimony. And this officer is not a lawyer. And he doesn't understand the rules of evidence. And just lawyers and myself–and so I'm going to explain it to you. This officer testified that he was at a hospital and so–and the defendant was at a hospital, . . . He also testified that at the hospital he received a bag and some coins. Okay. That evidence whether you believe it or don't believe it, that what's called admissible. However, he then testified that he was present when these coins were recovered and apparently he means he was present at the hospital. Then he made some statements about where those coins came from because of what someone else told him. And those

-11-

officers are not here, will not be called in this trial. And he cannot testify to what they told him. That's not admissible evidence. So for purposes of his testimony you may consider where he was. You may consider the testimony of his recovering the coins and the bag. You cannot consider anything that he says some other officer told him about how they obtained this bag or these coins. Does everybody understand that? All right. Otherwise, that would deprive any defendant from being able to cross-examine those witnesses because they're not going to be called as witnesses in the trial. All right.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A manifest necessity exists when "no feasible alternative to halting the proceedings" exists. State v. Knight, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The defendant bears the burden of establishing a manifest necessity. State v. Seay, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996).

Officer Bach's testimony relating what Officer Cave told him about discovering the purple bag was hearsay and was inadmissible at trial. See Tenn. R. Evid. 801, 802. When determining whether a mistrial is necessary after a witness had injected improper testimony, this court has often considered the following factors: (1) whether the improper testimony resulted from questioning by the state or was it a gratuitous declaration, (2) the relative strength or weakness of the state's case, and (3) whether the trial court promptly gave a curative instruction. See State v. Paul Hayes, No. W2001-02637-CCA-R3-CD, Shelby County (Tenn. Crim. App. Dec. 6, 2002), app. denied (Tenn. May 27, 2003).

In this case, the hearsay statement was elicited during direct examination by the state. However, we cannot say that the record reflects that the state intentionally sought to elicit the hearsay statement from Officer Bach. Secondly, the record shows the state presented relatively strong evidence of the defendant's guilt. As for the last factor, we note that the trial court provided the jury with a thorough curative instruction, explaining what part of the testimony was hearsay and that it was inadmissible as evidence, and that it did so in a timely fashion following the cross-examinations by the defense attorneys. We believe that the trial court's curative instruction was sufficient to admonish the jury not to consider the inappropriate statement. In most instances, we may presume that a jury follows the trial court's instructions. State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994). We conclude that the defendant has failed to establish that manifest necessity existed to warrant a mistrial and that the improper testimony did not render his trial unfair. The trial court did not abuse its discretion.

## III. SENTENCING

Regarding his final issue, the defendant contends that the trial court erred by merging his sentences when the facts constituting the elements of especially aggravated kidnapping and aggravated robbery overlap. His brief states the following:

> The sentences imposed on Defendant Holmes are excessive, not only because the severity is not supported fairly by the facts, but more importantly because while the elements of Especially Aggravated Kidnapping and Aggravated Robbery do, to some extent over lap, Defendant Holmes was unfairly sentenced under a Class A felony rather than a Class A and Class B felony for two separate indicted crimes arising out of the same singular set of facts. It is as though the Court and not the Legislature has decided that the crime of Home Invasion and the taking of personal property shall be sentenced as one "super-sized" offense.

> At sentencing, the Trial Court stated as follows: "I merged the robbery convictions with the especially aggravated kidnapping convictions. State vs. Anthony and State vs. Denton. They are double jeopardy problem situations. And there is no double jeopardy problem in this case because I did not sentence them on the aggravated robbery but merged it in with the kidnapping."

> The Defendant contends that the Court should have sentenced him separately under the Class A and Class B felony classifications in order to preserve his right to any and all potential remedies at law, including the double jeopardy provision of the United States and Tennessee Constitutions.

The state responds that the defendant waived any sentencing issues by failing to include a transcript of the sentencing hearing in the appellate record. The defendant filed a reply brief in which he states that the omission of the transcript is an oversight he is researching, and he contends that his sentences are also unconstitutional under Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004).

We note that the sentencing transcript remains absent from the record on appeal and that the Tennessee Supreme Court recently held that Tennessee's sentencing procedures do not violate the Sixth Amendment right to trial by jury described in Blakely and United States v. Booker, ____ U.S. ____, 125 S. Ct. 738 (2005). See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R11-CD, Davidson County, ___ S.W.3d ___ (Tenn. Apr. 15, 2005). Accordingly, the defendant has no argument regarding sentencing under Blakely. As for the argument as stated in the defendant's brief, we are at a loss to determine what he is asking this court to consider. Because we

-13-

cannot decipher his contention and his brief on this issue is devoid of citations to authorities or sound argument, this issue is waived.  <u>See</u> Tenn. Ct. Crim. App. R. 10(b).

Based on the foregoing and the record as a whole, we affirm the trial court's judgment.

_____

JOSEPH M. TIPTON, JUDGE